Our final case this morning is McWilliams v. Dinapoli, No. 217045. Mr. Hendrickson. Thank you, Your Honors, and may it please the Court, my name is Jeffrey Hendrickson and I represent Appellant Michael Dinapoli in this case. This is a Fourth Amendment case brought against Mr. Dinapoli under Section 1983. Mr. Dinapoli is a former deputy sheriff of Bryan County, Oklahoma, which sits on the Oklahoma-Texas border near Lake Texoma, where this incident occurred back in May of 2018. The District Court denied Mr. Dinapoli's motion for summary judgment based on qualified immunity, finding that Mr. Dinapoli, that there was evidence that Mr. Dinapoli had committed a constitutional violation under the Fourth Amendment, and that date, May 26, 2018, was clearly established. The facts of this case are somewhat straightforward, and for the purposes of this appeal, this Court is obligated to take the District Court's factual findings. Appellant Dinapoli generally agrees with that and is confining his argument to the District Court's factual findings, save for one point, which has to do with what the video of the incident shows, and I will get to that in the recitation of the facts. About Mr. McWilliams touching Mr. Dinapoli? Yes, Your Honor, that's correct. Now, you have argued that, I mean, your adversary has argued that your whole appeal is predicated on us crediting that argument, and you have said, no, it doesn't. How could you prevail if we say that, based on Judge Schroeder's factual conclusions, that Mr. McWilliams never actually touched Officer Dinapoli? How could you prevail? Your Honor, Appellant Dinapoli could prevail in that circumstance, based primarily on the argument that the law was not clearly established with regard to his conduct. So you can, so the law would have allowed a judge or a jury to say that if an officer comes up to me, or if I go up to that officer, and I am his or her personal space, and I do not touch him, but I am ugly, I say mean things to him, and then he starts punching, as we all have seen, me, hypothetically, in the chest, with or without aiming for the face. You're saying that the Constitution in 2018 was hazy enough that Officer Dinapoli might have reasonably thought, oh, yeah, I can punch him, even though he never even touched me, because he's in my personal space. Yes, Your Honor, that is Appellant Dinapoli's position, and primarily the reason for that. I want to address a point, because when you're saying it, the explanation sounds, of course, that that seems a little unusual, but the difference was Counsel, just to clarify then, if there's no touching, you're conceding there was a move on to prong two of qualified immunity. Is that what you're saying? Not necessarily, Your Honor. My second point to Judge Bacarach's question was going to be that the argument for no constitutional violation is stronger if the court agrees with Appellant Dinapoli's position on what the video shows, but even if the court does not agree with Appellant Dinapoli's position and does not take the video as blatantly contradicting the district court's findings, Appellant Dinapoli's nonetheless still that no constitutional violation was committed. The answer, Judge Bacarach, to your question is because of the officer's personal space. It is not the same as two private people on the street and the personal space that's involved in that regard. The officers are trained, Officer Dinapoli was trained, and had an understanding that the area around him is different than the area around a private person, primarily because he has tools on him that can cause a significant escalation and potentially cause significant bodily harm, that being a firearm. I don't know if he had a baton or some sort of nightstick on him. What about saying, go backwards, or to take a step backwards? Would that be out of the realm of possibility? It would not, Your Honor. In fact, Officer Dinapoli did take a step backwards when Mr. McWilliams approached him. Could he have taken another step backwards? It's possible, but on the same vein, could Mr. McWilliams have stopped and obeyed Officer Dinapoli's commands to stop advancing? Yes, he could have. At the end of the day, the question as to whether Officer Dinapoli could have taken another step backwards, I think, is best answered by the fact that we're not assessing this from a 20-20 hindsight point of view, but from Officer Dinapoli's perspective on the scene, what he was being faced with. So you're saying that the Constitution said that Officer Dinapoli, obviously, you're saying, well, he can arrest him or whatever, he can detain him. You're saying you would go beyond that, and you could say, no, he can start punching him in the chest because he's in his personal space, and he could have reached for his weapon. Your Honor, that is... That's quite an extraordinary argument. Your Honor, I disagree respectfully. I believe that you can quibble with the type of force that is used, quibble is probably not the right word, but you can debate about the type of force used, but there is case law, I can't cite a precise case at this point, but there's case law that discusses, looking with 20-20 hindsight at what exactly an officer does and the type of force that he uses, and perhaps slightly more force than necessary was used, but that doesn't push him to the perspective of per se engaging in a constitutional violation. More to the point, Your Honor, on the clearly established prong, the reason that Appellant Dinapoli is arguing that the law was not clearly established in May of 2018 has entirely to do with the cases relied upon by the appellee in the district court, which all have to do with custody, with having somebody being subdued, somebody who is unable to do anything else at all, somebody who is not a threat whatsoever because they are under control. There have been a variety of cases that have been cited, both by the district court and by the appellee, as clearly establishing the law that somebody who is subdued and is not a threat whatsoever because they can't act, they've been tied up, they've been placed in handcuffs, et cetera. What about Mr. Casey, who was not restrained, who was not tied up, he was free to go in  He was, that's true, Your Honor, but the difference between Casey v. City of Federal Heights in this case is that Mr. McWilliams' objective here was to get in Officer Dinapoli's face. He was approaching Officer Dinapoli, Officer Dinapoli was stepping back and was saying, step back, you're in my face. Mr. Casey was attempting to return a court file to the courthouse, and so when the officer in City of Federal Heights, or Casey, excuse me, was telling him to stop, it was not that the individual was aggressively approaching the officer for the sake of approaching the officer. It was that he said, I'm just trying to, more or less, I don't know what he said, I wasn't there, but more or less that he was just trying to get around him. I've got this court file, it's in my briefcase, look at it, and then she's trying to get around him. In that case, it's also different because the officer grabs Mr. Casey, places him in arm lock, Mr. Casey kind of rests free of the arm lock, but his arm is still held. He keeps continuing to try to walk towards the courthouse. The officer jumps on his back, at which time another officer comes up, looks like this might be a situation where help is needed, tazes him. More officers come up, take him to the ground, taze him, stand on his back, I mean, it is the closest case to this, Casey, City of Federal Heights is, but even it is distinguishable. Downstream from that case are cases like Dixon v. Risher, McAllen v. Morales, McCoy v. Myers, Perea v. Baca. I have a whole list of them, and they're all downstream from even Casey of City of Federal Heights because the finding that qualified immunity was denied in those cases has everything to do with the fact that the suspect or the individual was subdued. For example, I believe it's McCoy v. Myers. The officers went into an individual's hotel room and arrested him, or didn't arrest him, placed him under a carotid restraint, which caused him to lose consciousness, at which time they then tied his ... I think they handcuffed him, and then I believe they tied his legs as well, at which point they applied a kidney slap, which is a slap to wake him up, which he did, at which time he was subdued, and they then applied additional force, punched him, hit him, kick him, and then applied another carotid restraint to pass him out again. The second, and they're in that case, the reason qualified immunity was denied was because for the post-restraint uses of force, the individual couldn't do anything at all. He was tied up. That's the same with Weigel v. Brock. Counsel, would you say then that Casey is the closest case? I would say that, yes, Your Honor. I'm intrigued about this personal space doctrine. He wasn't charred when all was said and done. He wasn't written up for violating an officer's personal space. In fact, I doubt there is a statute to that effect. He was charged with resisting arrest. Isn't that correct? That's correct, Your Honor. But the officers never told him you're under arrest, so he's being charged with resisting something that he never knew was even happening. So, you know, that's a problem, but I want to go back to this personal space. How far does an officer's personal space go constitutionally? Is it six inches or a foot, or in COVID times, is it six feet? And how do we get a, and what's your best case that relies, not just mentions, but relies on a personal space envelope of protection, which everybody invades at their peril of getting tased and taken down? Judge Ebel, I don't have a case that says one way or the other, specifically as to a What do you think the space is, six feet or one foot or five feet or two and a half feet or what? My understanding, and I want to point out that this is not a point of the district court's factual findings, so we're not arguing outside, which I don't believe the court would have jurisdiction to consider. Well, I think you're arguing that we adopt a personal space doctrine, even if not defined on its outer perimeters, that we say it was invaded here, and when that's invaded, officers are entitled to take you down and hit you in the face, or not in the face, but hit you. Your Honor, my understanding of the training generally on this topic is that it is an arms-length type area. But training doesn't establish constitutional parameters. That's correct. I'm trying to find out what you think. What you think we should write as the first personal space case out there. Well, Your Honor, I would find that some sort of arms-length distance would be appropriate. That would obviously be a factual inquiry in every case where an officer was involved, but not a terribly difficult one to determine, I would say. Well, if it's a factual inquiry, and reasonable minds could disagree about what we have here, why wouldn't your argument fail on prong one? Why isn't that a jury issue? Well, it very well could for the purposes of this oral argument and this appeal. I think Officer DiNapoli's strongest argument is the clearly established law of pointings. I understand that. And we've been kind of going back and forth between prong one and prong two. I'm still interested in a couple of things on prong one. Do you agree that the Graham test is the test to be applied at prong one? Yes, Your Honor. And it seems the first factor would favor Mr. McWilliams, because we don't have a serious offense situation, do we? Well, Your Honor, I would disagree with that, only from the standpoint of saying that even if the district, excuse me, even if this court does not accept Officer DiNapoli's contention about the video evidence and the touching, that there is still some basis to believe an assault, as Oklahoma defines it, was committed, if not an assault. Because he touched the chest? Because he placed him in apprehension of bodily contact. Okay. The difference between assault and battery. Because he got in, not just that he touched the chest, but that he got too close to him, to Officer DiNapoli, and so he committed an assault because he got, say, six inches from him? Is that your argument? Yes. Okay. What about the third factor, though, which is actively resisting arrest? Was he actively resisting arrest before the punching? Your Honor, to judge Ebell's question in the first round of oral argument that we heard today, as Graham has literally defined, actively resisting arrest, no, the concept of an arrest had not yet been made known. However, active resistance as a concept also fits into the second prong of Graham. The threat that they... That's why I skipped to number three, but go ahead. Sure. Well, perhaps I'm revealing my best argument in this regard, is actually on number two. As this Court recently articulated in Englej, M-G-L-E-J, v. Gardner, can't tell you I know how to pronounce that exactly right, but that quotation with regards to when an individual, I see I'm out of time. May I finish my response here? I think you've finished your thought. With regards to when an individual is posing a threat to other officers or to the public, if they are actively engaged or disobeying a lawful order, and in this case, Officer DiNapoli was telling him to step back or you are in his face. So, with regards to prong two, that would be my answer. With regards to prong three, I would defer to the text of Graham. Your Honors, we would ask that the Court issue an order remanding the case to the District Court with direction to enter judgment in Officer DiNapoli's favor on qualified immunity. Thank you. Thank you, Counsel. Good morning, Your Honors, and may it please the Court, my name is Spencer Bryan, I represent the athlete, Mr. Gregory Williams. We're asking this Court today to dismiss the case on jurisdictional grounds or, alternatively, to affirm the District Court in denying the qualified immunity plea by Officer DiNapoli. Unless the Court has a preference, I intend to first address the jurisdictional issue before moving on to the qualified immunity question. On the jurisdictional issue, Mr. DiNapoli has essentially invoked the blatantly contradicted standard, which is a challenge to the facts that a reasonable juror could find as determined by the District Court. This Court has previously determined that the blatantly contradicted standard presents a high burden, a high threshold for the opposing party to meet. The Croson Court, or the Vet Court, I believe, also indicated that the litigant should be limited nature of the standard before invoking it on appeal. And I think that's one of the issues where this case fails on appeal. As in Vet, as we discussed in the briefing, the officer in that case attempted to present photographs of one side of an individual's face and ask the Court to draw inferences about the other side. That is indistinguishable from what Mr. DiNapoli is attempting to do here. He is asking the Court to draw inferences about what is going on with his chest by asking the Court to review video of his back. But I understand that argument, but I guess where I've lost you is on jurisdiction. You know, he's entitled to argue that the video blatantly contradicts the factual findings that Judge Schrader made, and you don't question that. So we have jurisdiction. You're just saying, right? I mean, you're just arguing, well, no, the video doesn't blatantly, there's ambiguities in the video, it doesn't blatantly, in your argument, contradict what Judge Schrader is finding. But you're not questioning that we have appellate jurisdiction to consider his argument on blatant contradiction, or are you? No, that is correct, Your Honor. I do agree with that. What I am saying is that his invocation of the blatantly contradiction standard fails the standard that he's applying. He can't satisfy that criteria, and by failing to satisfy that criteria, he is then challenging the factual findings of Judge Schrader. But like Judge Gregory, I don't see how you're making that into a jurisdictional argument. But when Judge Schrader determines that the facts that a jury could find would be that Mr. McWilliams never made contact with Mr. DiNapoli, and the blatantly contradicted standard would say, well, Judge Schrader got it wrong. The video blatantly contradicts that particular finding. There's lots of ways that Judge Gregory could have gotten it wrong, which we have jurisdiction to consider, if they decided just clearly erroneous precedent or something. And the blatantly contradict is simply one more way in which it can be argued that the district court got it wrong. Yes, I agree with you, Judge Ebel. I guess the way that I am looking at it is that because the blatantly contradicted standard is an exception to the general rule of having to accept the facts as the district court found them, if you cannot meet the blatantly contradicted standard, but yet you are still wanting to argue facts that are contrary to the district court, then what you are doing is you are arguing contrary to this court's jurisdiction because you are not accepting the facts as determined by the district court. That's essentially what I'm trying to argue, perhaps, in our take. Yeah, the Supreme Court has cautioned us to not very often call something a jurisdictional fight because it kind of messes up the jurisprudence. And I think that that caution would apply here, too. I mean, I don't know why we would have to call it a jurisdictional fight. We could simply ask, was it a correct ruling? I suspect that would be certainly a way to address it. Well, counsel, not to belabor the point, but as I understood Mr. Hendrickson's argument, he was saying this morning that even if there was no touching, he still has an argument for reversal here, and that seemed to be the argument he was making. And don't we have jurisdiction to consider that argument? Yes, Your Honor. I do believe that you do have jurisdiction to consider that argument. It was not until this morning that that was made clear. I know that there was some mention in the reply brief in that regard. And by the way, I'm not suggesting that Mr. Hendrickson conceded the blatant contradiction point. I'm just... But once we moved beyond that, he made the argument that I just mentioned. So, turning to the qualified immunity question, the court has discussed Casey. I know that Mr. Hendrickson has discussed Casey, and I do believe that Casey is the case that resolves this appeal on the qualified immunity question. If you look at Casey and you look at the cases that have followed Casey, and even the cases before Casey, including Dixon, it can be distilled down into a fairly simple, easy-to-apply standard. And that is, if you have essentially all the Graham factors, or substantially all of the Graham factors tipping in favor of the citizen, as opposed to law enforcement, then an officer who makes a decision to use significant force against that individual cannot do so if they have time and opportunity to provide some type of notice, or warning, or indication to the individual that they are under arrest. I think this is a simple notice and opportunity to comply rule that this court has developed. I think it's consistent with what the Constitution would require to give the individual an opportunity to avoid the use of force against them. And this particular case, that was never afforded to Mr. McWilliams. Well, could you just come back to Casey, though, because as I understood the argument a few minutes ago, there was a lot of confrontational conduct that Mr. McWilliams engaged in here. So, how do you respond to that? So the way that I would respond to that would be that when you're talking about, I guess, the prong to the perceived threat by the officer, that's a fact question. And when you go back to even the Dixon decision, when you had multiple officers with the Dixons on the side of the road, their testimony about what happened and the threat that were presented by the Dixons was materially different than what the Dixons communicated. And in that decision, this court said, that's a fact question. A jury can review what they perceive the threat to be and make a determination for themselves as to whether or not the individual presented a threat. And taking into the totality of the circumstances, what would be factored into answering that question. In this particular case, we have an individual who's obviously not suspected of committing any crime. He's not making any threats. He's not making any gestures. He has no weapons on him. There is no prior interaction between Mr. DiNapoli and Mr. McWilliams that would give him some reason to believe that he is prone to violence. Mr. McWilliams was 72 years old, or almost 70. Isn't there a proximity under which an officer, or any person, would feel actually a threat? I mean, if, let's say, there was a police officer that was a slender woman, a small framed woman, and a 300 pound guy came up yelling and shouting and was within six inches of her. Is she not permitted to do anything to cause him to back off or to defend herself? I believe that she would certainly have the ability and opportunity to do exactly what the case law would say, and that is, if she does feel a threat, she can detain that individual while she sorts out whatever the status quo is. But under no circumstances does the case law say that you can just initiate physical violence against an individual. Well, but physical violence, I mean, the postulate that I gave you that physical violence might be the only way to stop him. I mean, if she said, please back away, but he's furious at her, what options does she have other than a physical response? Under Casey and under, I believe, the discussion of Casey and McCoy, the option at that point would be to tell the individual that they are either under arrest, place them in handcuffs, give the person some indication that whatever they are doing is problematic for the officer to the point that I am going to put you in custody. So if, so do you think this whole case turns on whether the officer gave McNapoli the notice of, not McNapoli, but McWilliams, the notice that he was under arrest? I believe this case can turn on that issue, because my reading of the case law, that's exactly what the case law would suggest that Mr. McNapoli should have done. Well, didn't he ask him to stand back, and Mr. McWilliams was non-compliant with that order? So using the notice and opportunity to comply standard that you mentioned, wasn't there notice to Mr. McWilliams that he needed to back off, stand back, and was given an opportunity to comply, and then he didn't comply? I would disagree with that, Your Honor, and the reason why is because simply telling someone to step back is not an indication to them that they are necessarily doing something that's wrong, illegal, unlawful, or that would subject them to arrest. If Mr. McNapoli had said, I'm going to place you under arrest if you do not step back, I think that would satisfy Casey, that would satisfy the issue in McCoy. That type of instruction, yes, I would agree, but simply telling Mr. McWilliams that he needed to step back, I don't think is sufficient under these facts, because Mr. McWilliams, he may not. What I'm saying is that in a police-citizen encounter, if the citizen gets close to the police officer and the police officer says, you need to stand back, unless the officer goes on to say, or you're under arrest, that that person can stand his or her ground. I don't think there are necessarily any magic words that are required, but I think it has to be communicated sufficiently that you do this or else. It is not a just simply do this. I think if you say, do this or else, I think that communicates to the individual that I'm not merely asking you a please question, I'm giving you a command. But isn't the or else disassumed? I mean, when a police officer tells you to do something, isn't it always assumed there's an or else? I would disagree with that, no. I would not agree with that. If an officer simply tells you to do something, I don't believe that there is necessarily a requirement that you do that. Oklahoma law is fairly well established that a person can resist an unlawful command. An officer that provides an unlawful command is not entitled to have that command followed. By the way, are we still operating within Casey or is there some other case that you think helps you on this notice and compliance? Judge Matheson, I believe your discussion in McCoy about Casey, when it specifically talks about how if they had just, in Casey, if they had just given him the warning that he was under arrest, that would have satisfied that requirement. The violation there happened after he had been unconscious, had been handcuffed, his legs were tied. That's when the violation happened. Yes, I agree. I guess I'm mixing these two. In the McCoy decision, there was a brief kind of discussion about what Casey held and it was in that context that I was referencing McCoy. I apologize for confusion. Your Honor, I see my time is almost up. We would ask the Court again to affirm Judge Schroeder and his denial of qualified immunity in this case. Thank you. Thank you, counsel. Mr. Henderson, I believe we have one more question. Thank you. I appreciate you indulging me. My question is, there's been considerable discussion about whether DiNapoli said get back. I don't see that in Judge Schroeder's findings and for our review at this juncture, we typically are constrained by the factual conclusions made by the district judge. Where can I go in order to take into account an assumption that Officer DiNapoli told Mr. McWilliams, get back, before there was physical contact? Your Honor, do you mind if I grab my brief real quick? Sure. I will tell you, what I know off the top of my head is, it is not an explicit get back. It is a get back or, I believe he says, or you're in my space. Okay, and where, is that in Judge Schroeder's findings? That is in Judge Schroeder's findings, and it is, let me pull it up for you real quick. It is in the, I don't have the record site for you, I apologize, but it looks to be 1, 2, 3. It is at the bottom of the fourth paragraph, quote, the plaintiff came to stand less than an arm's length from Defendant DiNapoli, and the Defendant DiNapoli told the plaintiff to either, quote, get back, end quote, or that he was, quote, in my face, period, end quote. Okay. So that's where that argument comes from. Okay. Thank you so much. Anything else? Okay. Thank you very much. Thank you. Thank you to both counsel, we appreciate the arguments this morning. The case will be submitted.